# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# TERRE HAUTE DIVISION

| | |
|---|---|
| **CHRIS J. ROSE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 2:10-cv-46-WTL-MJD |
| | ) |
| **CITY OF TERRE HAUTE, INDIANA,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on a motion for summary judgment filed by Defendant City of Terre Haute, Indiana ("the City") (dkt. No. 20). The motion is fully briefed and the Court, being duly advised, **GRANTS** the City's motion for the reasons set forth below.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." A party must support its assertion that a fact cannot be or is genuinely disputed by citing to particular parts of materials in the record or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the asserted fact. FED. R. CIV. P. 56(c)(1).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a]

party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted). "If the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law because 'a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.'" *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## II.  BACKGROUND

The relevant facts of record viewed in light most favorable to Plaintiff Chris Rose, the non-moving party, are as follow.

In 2008, Rose was a student at Indiana State University engaged in the study of Safety Management. Rose completed an unpaid internship at the Terre Haute Waste Water Treatment Plant ("WWTP"), a division of the City, while completing his degree. While working as an intern, Rose was regularly referred to by fellow employees as "Big Black." Rose never complained to his supervisors about the nickname.

Following graduation, Rose applied for a full-time job with WWTP, but there were no available positions at that time. Approximately six months later, the job of Safety Coordinator became available at WWTP. At the insistence of several employees, the department head, Mark Thompson, contacted Rose and offered him the Safety Coordinator position, which Rose accepted. Rose filled out his new hire information sheet and received a copy of the City's Anti-Harassment Policy and Policy Manual on January 26, 2009, and began work on January 27,

2

2009.

According to Rose's New Hire Information sheet, Rose started at a salary of $17.85 per hour, or $30,000 per year. Rose was not told his salary when he filled out his New Hire Information Sheet; rather, the salary information was filled in at a later time. While he was never told how much he would be making prior to commencing employment, Rose assumed that he would be starting at $41,000 to $42,000 per year, which was the approximate ending salary of John Shields, Rose's predecessor, and the maximum amount budgeted by the City for the position.

Supervisor of Operations Robert Elkins greeted Rose on his first day as a full-time employee for the City by saying "Welcome back, Big Black!" Rose spoke with Thompson about Elkins's statement shortly after starting at WWTP and Thompson addressed the issue with Elkins, after which Elkins no longer referred to Rose as "Big Black." After or around the time of the incident with Elkins, two other employees also greeted Rose similarly, including "What's up, Big Black?" and "Big Black, welcome back!"

When Rose received his first paycheck on Friday, January 30, 2009, a friend of his and former WWTP intern "did the math" by extrapolating his pay and told Rose that he was only making $20,000 per year.[1] Sometime between January 30th and February 2nd, Rose spoke with a supervisor on the building and maintenance crew at WWTP regarding transferring to that division. Rose also contacted Shields and offered him the Safety Coordinator job back at a salary of $20,000 (the amount he assumed he was being paid), despite the fact that Shields had

---

[1]This calculation presumably was based upon Rose's net pay rather than his gross pay.

been fired from the job and there was no authorization from anyone at the City for Rose to make such an offer.

On February 2nd, Rose met with Thompson to discuss his dissatisfaction with his job. His complaints included his salary, job title, company car arrangement, and the "Big Black" nickname. Thompson informed him that his starting salary was $30,000 per year and was based upon his education and experience level, which upset Rose. Rose was also dissatisfied with not being able to take his company car home during non-work hours and with the fact that his title was "Safety Coordinator" rather than "Safety Director." Rose also informed Thompson of the two incidents that he had been referred to as "Big Black" by co-workers other than Elkins. During the meeting, Thompson raised the issue of Rose's communications with the building and maintenance crew regarding transferring to that department and the unauthorized job offer Rose made to Shields.

On February 4, 2009, Rose called in sick despite not yet having any benefit leave time accrued. The next day, Thompson met with Rose and confronted him about his unexcused absence. Rose offered no explanation for his absence other than being unhappy with how he was being treated at WWTP, and his response was to again express his dissatisfaction with his pay level, position, not receiving a company car, and being called "Big Black" by co-workers. When asked by Thompson if he still wanted to work at WWTP, Rose responded in the negative and quit.

Rose was replaced by Michael Sebring, a white male. Sebring was paid a $30,000 starting salary for the Safety Coordinator position.

### III. DISCUSSION

Rose asserts claims of hostile work environment and disparate treatment race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII") and a claim of disparate treatment under 42 U.S.C. § 1981. Title VII prohibits employers from discriminating against individuals on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A claim under § 1981 includes the same elements and employs the same analysis and methods of proof as a Title VII race claim. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). The City has moved for summary judgment on all counts contained in Rose's Complaint. The analysis of each claim is addressed below.

### A. Hostile Work Environment Claim

Rose contends that he was subjected to a hostile work environment in violation of Title VII by being called "Big Black" by his co-workers. Hostile environment claims based upon racial harassment are reviewed under the same standards as sexual harassment. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). In order to prevail on a hostile work environment claim, the plaintiff must show that the conduct at issue had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (citing 29 C.F.R. § 1604.11(a)(3) (1985)). The harassment must be sufficiently severe or pervasive to alter the condition of the employee's employment and create an abusive working environment. *Id.* at 67. "'[R]elatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

5

To get past summary judgment on a hostile work environment claim, Rose must provide sufficient evidence to create a material issue of fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) his race was the basis for the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for the employer's liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Even assuming that Rose could succeed on the first three elements, Rose clearly has failed to establish the fourth and therefore he cannot succeed on his hostile environment claim.

An employer is not automatically liable under Title VII for harassing behavior by co-workers;[2] rather, employers are only liable where they do not "promptly and adequately respond to employee harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011). "To avoid liability, the employer must respond in a manner reasonably likely to end the harassment." *Id.* It is undisputed that Rose did not complain to anyone regarding the use of the nickname "Big Black" during his internship; therefore, there is no basis for employer liability for anything that occurred during that time.[3] Rose does not dispute the fact that Thompson took action to address the used of the nickname by Elkins immediately after it was brought to his attention and that Thompson's action was sufficient to correct Elkins's behavior. As to the other two uses of the nickname that Rose complained to Thompson about, Rose quit before he gave the City a chance to address the issue. Rose thus has failed to show that the City was negligent

---

[2]Rose does not assert in his response to the instant motion that any of the employees who referred to him as "Big Black" were supervisors for Title VII purposes.

[3]The parties dispute whether Rose was an employee for Title VII purposes while he worked as an unpaid intern; the Court need not resolve that dispute because even assuming Rose was an employee his hostile work environment claim must fail because he has not demonstrated any basis for employer liability for any harassment during his internship.

in discovering or addressing the alleged harassment and thus has not shown a basis for the City's liability for the actions of his co-workers.

While this failure is fatal to Rose's claim, the Court notes that Rose also has failed to demonstrate that his co-worker's use of the nickname "Big Black" constituted a hostile work environment in any case. The threshold for a plaintiff's showing in this regard is high; the plaintiff must establish that the behavior was severe or pervasive enough to create an abusive work environment, and that it was so objectively offense that it altered the conditions of his employment. *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). To determine whether a plaintiff's work environment is hostile within the meaning of Title VII, courts consider a variety of factors, including the frequency of the harassing conduct, the severity of the conduct, whether the conduct was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Saxton*, 10 F.3d at 534. Not only is the effect of the discriminatory conduct on the plaintiff taken into account, but also the impact it would likely have on a reasonable employee in the same position. *Id.* "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.*

Here there is no evidence that Rose's co-workers used the term "Big Black" in a threatening or hostile manner or that Rose felt threatened by it. In fact, Rose testified in his deposition that he did not believe that his co-workers used the nickname with animosity, but rather he believed they were ignorant as to how the term would impact him personally. In addition, the three incidents Rose identifies specifically clearly do not rise to the level of

7

"pervasive," and Rose does not point to evidence in the record that establishes that the nickname was used pervasively during his internship. Thus, Rose has not demonstrated that the racial harassment he experienced–the use of the nickname "Big Black"– was severe or pervasive enough to create an actionable hostile work environment.

Because the evidence of record, viewed in the light most favorable to Rose, is not sufficient to establish the elements of Rose's hostile work environment claim, the City is entitled to summary judgment on that claim.

### B. Disparate Treatment Claims

Rose brings claims of disparate treatment brought under both Title VII and § 1981 based upon his salary while an employee at WWTP. He claims that he was not paid in accordance with an agreement that he had with the City in contrast to other white employees who were paid in accordance with agreements, and that similarly-situated white employees were paid more for similar work.

#### *1. Title VII Claim*

In order to maintain a claim under Title VII, a party must first file a charge with the Equal Employment Opportunity Commission ("EEOC") within the period required by the statute. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973). Rose alleges both hostile work environment discrimination and disparate treatment discrimination in his complaint; however, Rose's EEOC charge includes only the three incidents of being referred to as "Big Black" by co-workers occurring between January 27, 2009, and January 30, 2009, and mentions nothing about the disparate treatment as it related to his salary. As a general rule, Title VII plaintiffs cannot bring claims in a lawsuit that were not included in the EEOC charge. *Cheek v.*

8

*Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "[T]he scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC. An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). The purpose of this limitation is for consistency with the primary jurisdiction of the agency, as well as to give the employer some notice of the conduct that forms the basis of the employee's complaint. *Id.* It also gives the agency and the employer the opportunity to attempt conciliation without resorting to the court system. *Id.* Courts do recognize, however, that the EEOC process is often initiated by lay persons and offer some leniency in this requirement by permitting claims in the complaint that bear a reasonable relationship to the allegations in the charge if the claim in the complaint can reasonably be expected to arise from an EEOC investigation of the allegations in the EEOC charge. *Cheek*, 31 F.3d at 500. A plaintiff is not required to allege each and every fact that forms the basis of each claim in the complaint; however, some level of specificity is required. *Id.*; *Rush*, 966 F.2d at 1111.

In *Rush*, plaintiff Patricia Rush, an African American woman, was employed as a word processing specialist at the McDonald's Indianapolis regional office. Rush violated McDonald's written attendance policy by not reporting to work for three days. Upon her return to work, Rush was given a written notice of termination. She then filed a charge of racial discrimination with the EEOC alleging that she was terminated due to her race and that McDonald's had discriminatory promotion practices. In Rush's subsequent judicial complaint she alleged several forms of race-based discrimination, including her termination, McDonald's delay in promoting

9

her from part-time to full-time status, and racial harassment. The Seventh Circuit determined that while Rush had preserved her disparate treatment claims, her claims relating to racial harassment were never properly presented to the EEOC. *Rush*, 966 F.2d at 1111. The court stated that "it will not suffice to file general charges with the EEOC . . . and then to expect that this allegation will permit all claims of race-based discrimination in a subsequent lawsuit." *Id.* at 1112. Claimants must specifically describe conduct giving rise to the claims in their EEOC charge in order to bring those claims in a judicial proceeding. *Id.*; *see also Cheek*, 31 F.3d at 503 ("When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge.").

This case is similar to the situation in *Rush*, where one form of discrimination was alleged in the EEOC charge, but other types of discrimination are included in the judicial complaint. Rose's EEOC charge describes only the three incidents of being called "Big Black" to support his claim that he was subjected to hostile work environment discrimination. Nowhere in the charge does he mention discrimination as it relates to his salary and benefits, nor does he provide any facts from which such form of discrimination could be inferred or uncovered in the EEOC investigation process. Because Rose's EEOC charge clearly relates only to hostile work environment discrimination based on race and includes no facts relating to his disparate treatment claim, the Court determines that Rose failed to exhaust his administrative remedies on the Title VII disparate treatment claim and the City is entitled to summary judgment on this claim.

### 2. § 1981 Claim

In addition to his claim of disparate treatment under Title VII, Rose also brings a claim of disparate treatment under 42 U.S.C. § 1981. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of the laws . . . as enjoyed by white citizens." 42 U.S.C. § 1981(a). In analyzing a claim of discrimination, courts use the same analysis that is used for Title VII cases. *Patton v. Indianapolis Public School Bd.*, 276 F.3d 334, 338 (7th Cir. 2002). Plaintiffs alleging discrimination under § 1981 may prove such discrimination using either a direct or indirect method of proof. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849-50 (7th Cir. 2008). The direct method requires that the plaintiff produce evidence that the defendants were motivated by animus toward a protected class when he suffered some adverse employment action. *Id.* If a plaintiff cannot present direct evidence of discrimination, he may pursue his claim using indirect evidence. To show a prima facie case under the indirect method, the plaintiff must show (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered some adverse employment action; and (4) other similarly-situated employees not in the same class were treated more favorably. *Id.*

Rose has not presented any direct evidence of racial animus that lead to his disparate treatment; therefore he must prove his prima facie case using the indirect method. With the exception of the first element of the analysis, Rose is unable to show that he can satisfy the other three elements.

First, even viewing the facts in light most favorable to Rose, there is no factual dispute with regard to whether Rose was meeting his employers legitimate performance expectations. Rose had an unexcused absence after only five days of work despite the fact that he had not yet

accrued any benefit leave time. Rose signed an acknowledgment stating that he had received the policy manual and agreed to abide by its conditions, one of which was the policy on leave time. Furthermore, Rose acknowledged in his deposition that he did not have any time accrued to take off of work. Rose also testified that, on his own initiative and without authorization from his supervisor, he called Shields, the former employee who had been terminated by the City, and offered him his job back if he would be willing to accept a salary of $20,000. All of these events occurred within the first four days of Rose's employment, and Rose was called into two meetings by his supervisor – one on February 2nd and one on February 5th – regarding his conduct where it was expressed to him that his actions were not acceptable. Rose cannot satisfy the second element of his prima facie case because he clearly failed to meet the legitimate expectations of the City with regard to his conduct during the brief time he was employed.

Second, there is no evidence that Rose suffered an adverse employment action. When confronted by Thompson on February 5th regarding his unexcused absence, he was not disciplined or fired; rather, when asked if he wanted to remain at his job, Rose quit and walked out. To satisfy the third element of his prima facie case, Rose argues that he was constructively discharged and quit due to his frustration over the racial discrimination that existed at WWTF. "An employee can assert a claim of constructive discharge when [he] is forced to resign because [his] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). A plaintiff's resignation is not voluntary if quitting was the only way he can extricate himself from the intolerable condition. *Perry*, 126 F.3d at 1015. A plaintiff must show that conditions were even more egregious than that required for a hostile work environment claim because employees are

12

generally expected to remain employed while seeking redress in order to allow the employer to address the situation before it causes the employee to quit. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). If an employee quits without giving his employer a reasonable opportunity to correct the problem, he has not been constructively discharged. *Grube*, 257 F.3d at 728.

Rose cannot satisfy either of these criteria as a matter of law. As previously discussed, the treatment Rose was subjected to does not even rise to the level of hostile work environment, let alone the elevated standard required for a finding of constructive discharge. Even accepting Rose's argument that he was subjected to "unbearable" conditions while at WWTP, the fact remains that he did not give the City adequate time to address the issue before voluntarily terminating his employment. According to Rose, he addressed the first incident of being called "Big Black" by Elkins with Thompson shortly after beginning his employment, and Thompson promptly addressed and resolved the issue. Rose then raised the other two incidents of harassment with Thompson at the February 2nd meeting, but instead of allowing Thompson to address the issues regarding the harassment and pay disparity, Rose chose to quit due to his frustration over the use of the nickname, pay, title, and the City's refusal to give him a company car. He did not give the City a reasonable opportunity to address and, if necessary, correct the problem. Therefore, the Court finds that Rose was not constructively discharged, and thus there was no adverse employment action to satisfy the third element of his prima facie case.

Finally, there is no factual dispute as to whether similarly-situated white employees were treated more favorably. Rose claims that he was not paid in accordance with an agreement made with the City while other white employees were. In his deposition testimony, however, Rose

states that he was never told how much he would be making prior to starting the job and just assumed that he would be making the same amount as his predecessor. In fact, the issue of pay was never addressed until after Rose had received his first paycheck. Rose cannot claim that he was not paid according to an agreement with the City because there is no evidence that such an agreement was ever actually made. Rose also offers no evidence that other white employees had any agreements with the City prior to commencing employment regarding their pay and that they were in fact paid in accordance with these agreements. In addition, Rose has presented no evidence that similarly-situated white employees were paid more. He attempts to compare himself to lab technicians at WWTP, which is a completely different position from safety coordinator, and to Shields, who had considerably more experience and time at the safety coordinator position than Rose. The only person to whom Rose could be said to be similarly-situated is his successor, Sebring, who was paid the exact same starting salary as Rose. Thus, Rose cannot satisfy the fourth element of his prima facie case because he cannot show that similarly-situated white employees were treated more favorably, entitling the City to summary judgment in its favor on Rose's § 1981 claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment is **GRANTED** in its entirety.

SO ORDERED: 06/07/2011

_____
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

14

Copies to all counsel of record via electronic notification.